No. 83–791. TEXAS *v.* MEAD. Ct. Crim. App. Tex. Motion of respondent for leave to proceed *in forma pauperis* granted. Certiorari denied.

JUSTICE STEVENS, respecting the denial of certiorari.

The question that JUSTICE REHNQUIST now believes merits review—the proper standard of review concerning a *Witherspoon* ruling—was extensively analyzed by the Court of Appeals and presented in the petition for certiorari in *O'Bryan* v. *Estelle,* 714 F. 2d 365 (CA5 1983), cert. denied *sub nom. O'Bryan* v. *McKaskle, ante,* p. 1013.[1] That question is not, however, presented by the State of Texas in its certiorari petition in this case.[2]

_____
[1] Indeed, JUSTICE REHNQUIST discusses *O'Bryan, post,* at 1046, and n. 8. JUSTICE BRENNAN and JUSTICE MARSHALL dissented from the denial of certiorari in *O'Bryan* on the basis of their continuing belief that the death penalty constitutes cruel and unusual punishment. No other Justice recorded a dissent from that denial. Moreover, had THE CHIEF JUSTICE, JUSTICE REHNQUIST, and JUSTICE O'CONNOR, who today find the question warranting an exercise of certiorari jurisdiction, voted to grant in that case, under our Rule of Four the question would now be before us, and hence there would presumably be no need for today's dissenting opinion.

[2] Of course, if the petition in this case had been granted, the parties would naturally have briefed the question that is presented and argued in Texas' petition. Texas presumably would have had to have waited until oral argument to discover that the question JUSTICE REHNQUIST finds in this case is the one it presented.

The only question raised in the certiorari petition reads as follows:

"WHETHER THE TEXAS COURT OF CRIMINAL APPEALS COR-RECTLY APPLIED *WITHERSPOON* V. *ILLINOIS,* 391 U. S. 510 (1968) AND *ADAMS* V. *TEXAS,* 4[4]8 U. S. 38 (1980), WHEN IT REVERSED A TRIAL COURT'S EXCLUSION FOR CAUSE OF ONE VENIREMAN WHO UNAMBIGUOUSLY STATED THAT HE WOULD AUTOMATI-

Since the question JUSTICE REHNQUIST has discussed at such length "was neither presented to the [Texas] cour[t] nor presented to this Court in the petition for certiorari," *Eddings* v. *Oklahoma*, 455 U. S. 104, 120 (1982) (BURGER, C. J., joined by WHITE, BLACKMUN, and REHNQUIST, JJ., dissenting),[3] and since JUS-

---

CALLY VOTE TO PRECLUDE IMPOSITION OF THE DEATH PENALTY." Pet. for Cert. i.

More specifically, Texas contends that the defense failed to rehabilitate the venireman excused for cause after the venireman had initially expressed an unequivocal opposition to the death penalty, arguing that the "voir dire examination, as a whole, demonstrates a juror who would automatically vote against the imposition of the death penalty . . . ." *Id.*, at 9. Given the nature of the question presented, the petition primarily consists of a transcript of the *voir dire* examination of the excused venireman. In other words, Texas asks that *this Court* conduct a *de novo* review on the *Witherspoon* issue.

The dissent's reasoning in attempting to suggest that the "deference" question was even decided below, much less presented in the petition, is quite difficult to follow. JUSTICE REHNQUIST finds "no support in our case law for the utter absence of deference paid to the trial court's judgment in this case," *post*, at 1048, but somehow concludes that the Texas Court of Criminal Appeals apparently felt that it was required to disregard totally the trial court's judgment on the basis of our case law, *post*, at 1044, n. 2, notwithstanding the fact that in *Hughes* v. *State*, 563 S. W. 2d 581, cert. denied, 440 U. S. 950 (1979), the Texas Court of Criminal Appeals explicitly stated *with respect to a Witherspoon issue before it:*

"We must be mindful that where we only have a cold record before us the trial judge in passing on the answers of the 'equivocating veniremen' has the opportunity to observe the tone of voice and demeanor of the prospective juror in determining the precise meaning intended." 563 S. W. 2d, at 585 (dictum).

The dissent below in this case quoted this language, and argued that the majority had erred in not following *Hughes* in this case. App. to Pet. for Cert. A-22. In light of the fact that the only statement ever made by the Texas Court of Criminal Appeals on the "deference" question is favorable to the prosecution, it is no wonder that Texas did not present this question in its petition.

[3] The dissenting opinion below, it should be noted, was filed regarding the court's denial without opinion of the State's second motion for rehearing. One perhaps could speculate on the basis of the papers we have before us that the State attempted to raise the "deference" issue in its second motion for rehearing, since the issue was discussed at the close of the dissenting opinion. *Id.*, at A-21 to A-22. It would appear, however, from the dissenting opinion that the propriety of the arguments presented in the State's second motion was in some doubt, and the dissent was quite prepared to reconsider the case *sua sponte*. *Id.*, at A-1 to A-2. There was no response to the dissent,

TICE REHNQUIST, by not discussing the question that is presented, apparently agrees that it does not merit review, see, *e. g.*, *United States* v. *Johnston*, 268 U. S. 220, 227 (1925) ("We do not grant a certiorari to review evidence and discuss specific facts"); see also *Torres-Valencia* v. *United States*, 464 U. S. 44 (1983) (REHNQUIST, J., dissenting), I simply note that the Court's decision to deny the petition for a writ of certiorari in this case is demonstrably consistent with the principles which inform our exercise of certiorari jurisdiction.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE, and JUSTICE O'CONNOR join, dissenting.

Respondent Mead was convicted by a jury of the capital offense of murdering a police officer acting in the line of duty. He was sentenced to death. On appeal, Mead argued that some veniremen were improperly excluded from the jury because of their opposition to the death penalty. See *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968). The Texas Court of Criminal Appeals, with four judges dissenting, conducted a *de novo* review of the *voir dire* examination of one of the excluded veniremen and agreed with respondent. 645 S. W. 2d 279 (1983) (en banc).[1] The court gave no deference to the judgment of the trial court that the juror was unalterably opposed to the death penalty and would purposely bias his answers accordingly. Because of the substantial disarray among state and federal appellate courts as to the degree of deference, if any, due to a trial court's determination that a juror may

---

the language in *Hughes* was not disapproved by the majority, and hence there are two reasonable conclusions: (1) the majority below, even after giving deference to the trial court's ability to observe the demeanor of the venireman, nevertheless concluded that his excusal for cause was erroneous; or (2) the State had waived whatever arguments it raised in its second motion for rehearing as a matter of state practice by failing to raise them earlier. Of course, since Texas is not raising the "deference" question in its petition, it is understandable that it has not attempted to show that the question was properly raised below.

[1] The court reversed Mead's conviction and remanded the case for a new trial. Ordinarily, the appropriate remedy for a *Witherspoon* violation is to reverse only the death sentence, not the underlying conviction. 391 U. S., at 516–518. See also *Adams* v. *Texas*, 448 U. S. 38, 51 (1980). Apparently, however, the Texas Court of Criminal Appeals has no authority to direct a new trial before a different jury solely on the issue of punishment. See *Ellison* v. *State*, 432 S. W. 2d 955, 957 (Tex. Crim. App. 1968).

be excluded for cause under *Witherspoon*, I would grant certiorari to the Texas Court of Criminal Appeals and review the case.[2]

In *Witherspoon*, 391 U. S., at 522, we held that a venireman cannot be excluded for cause in a capital case simply because he voices "general objections" to the death penalty or expresses "conscientious or religious scruples against its infliction." Provided the venireman is willing to fulfill his oath as a juror and consider the full range of penalties provided by state law, he may not be disqualified on account of his beliefs. We stressed, however, that the State is not disabled from challenging jurors for cause when they make it clear that they would "vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." *Id.*, at 522, n. 21. In subsequent cases we have reaffirmed that the State has a legitimate interest in obtaining jurors who will consider and decide the facts impartially and faithfully apply the law as charged by the court. *Adams* v. *Texas*, 448 U. S. 38, 46 (1980); *Lockett* v. *Ohio*, 438 U. S. 586, 596–597 (1978); *Boulden* v. *Holman*, 394 U. S. 478, 482 (1969).

As a result of *Witherspoon* and these later cases, trial courts are faced with the difficult task of distinguishing between a venireman so unalterably opposed to the death penalty as to be unable to apply the law impartially and one who, despite his objections, will conscientiously seek to apply the law in accordance with the facts developed at trial. We have mandated this inquiry; but we have failed to articulate any standard of review for alleged *Witherspoon* violations. We have failed to explain whether a trial court's determination that a given venireman may be excluded for cause under *Witherspoon* should be reversed only if, like other factual

---

[2] The Texas courts are of course free, as a matter of state law, to decide for themselves what deference shall be given by appellate courts to the findings of trial courts. But since in this case the four dissenting judges stated that under the majority's result "the discretion of trial judges across this state in excusing potential venirepersons under *Witherspoon* has been seriously eroded," App. to Pet. for Cert. A–21, while the majority insisted that "[t]his Court . . . is bound by the decisions of the Supreme Court of the United States," *id.*, at B–2, the Texas Court of Criminal Appeals apparently felt that it was required to conduct *de novo* review of the trial court's rulings as a matter of federal constitutional law. The issue also arises in federal courts entertaining petitions for writs of habeas corpus under 28 U. S. C. § 2254, see nn. 7 and 8, *infra*, where the standard of review is governed by 28 U. S. C. § 2254(d). See *Sumner* v. *Mata*, 449 U. S. 539 (1981); *Marshall* v. *Lonberger*, 459 U. S. 422 (1983).

determinations, it is clearly erroneous or whether an appellate court must examine the transcript of the *voir dire* and draw its own conclusions, with no deference accorded the trial court's judgment.[3]  The result, predictably, has been near chaos throughout the state and federal appellate courts.

A review of the decisions of 20 States which have grappled with the application of *Witherspoon*[4] shows that appellate courts in 7 of those States grant trial courts considerable discretion in excusing jurors based on their opposition to the death penalty and will disturb such rulings only for a clear abuse of discretion.[5]  Six States, including Texas, grant no leeway whatsoever to the trial court. The appellate courts conduct their own review of the record and make their own *de novo* determination of the propriety of any exclusions.[6]  The other seven States, without explicitly mentioning any standard, also appear to engage in *de novo* review, combing the record for errors with no mention of, or deference to, the trial court's opportunity to observe the demeanor of the veniremen and hear the tenor of their responses.[7]

---

[3] Generally, in matters of jury selection, we have explicitly required deference to the decisions of trial courts.  See, *e. g., Irvin* v. *Dowd,* 366 U. S. 717, 723 (1960).  But in *Witherspoon* and the cases following it, the language of deference is conspicuous by its absence.  Lower appellate courts are thereby left to guess whether the traditional deference has been set aside in this limited context.

[4] Thirty-eight States have a death penalty.  In many of those States, however, capital cases are few and far between, and it is impossible to determine the standard of review that would be applied to alleged *Witherspoon* violations.  In some other States, although the issue has arisen, it has been dealt with in conclusory terms which do not reveal whether any deference was paid to the trial court's judgment.

[5] *Clines* v. *State,* 280 Ark. 77, 87–88, 656 S. W. 2d 684, 689 (1983); *Hooks* v. *State,* 416 A. 2d 189, 194–195 (Del. 1980); *People* v. *Free,* 94 Ill. 2d 378, 402–403, 447 N. E. 2d 218, 230 (1983); *State* v. *Treadway,* 558 S. W. 2d 646, 649 (Mo.) (en banc), cert. denied, 439 U. S. 838 (1977); *State* v. *Kirkley,* 308 N. C. 196, 206, 302 S. E. 2d 144, 150 (1983); *State* v. *Trujillo,* 99 N. M. 251, 252, 657 P. 2d 107, 108 (1982); *Turner* v. *Commonwealth,* 221 Va. 513, 523, 273 S. E. 2d 36, 43 (1980).

[6] *People* v. *Lanphear,* 26 Cal. 3d 814, 841, 608 P. 2d 689, 703–704 (1980); *Blankenship* v. *State,* 247 Ga. 590, 593, 277 S. E. 2d 505, 509 (1981); *State* v. *George,* 371 So. 2d 762, 765 (La. 1979); *State* v. *Anderson,* 30 Ohio St. 2d 66, 70, 282 N. E. 2d 568, 570 (1972); *State* v. *Harrington,* 627 S. W. 2d 345, 349– 350 (Tenn. 1981); *Rougeau* v. *State,* 651 S. W. 2d 739, 740–745 (Tex. Crim. App. 1982) (en banc).

[7] *Ex parte Bracewell,* 407 So. 2d 845, 846–847 (Ala. 1979); *Maggard* v. *State,* 399 So. 2d 973, 976 (Fla. 1981); *Frith* v. *State,* 263 Ind. 100, 107–108, 325

The degree of confusion and the number of conflicting decisions among the state courts on such an important issue of federal constitutional law are troublesome, to say the least. This same disarray exists in federal courts entertaining petitions for writs of habeas corpus under 28 U. S. C. § 2254. For example, a panel of the Court of Appeals for the Fifth Circuit recently split three ways on the question.[8] And the Eleventh Circuit reached opposite results on the proper standard of review in two recent cases and has granted rehearing en banc in one of the cases to consider the issue.[9] I believe this Court has an obligation to clarify its holding in *Witherspoon* and to resolve these conflicts.

Obviously, there is no simple litmus test for determining when a juror would automatically vote against imposition of the death penalty or be unable to make an impartial decision as to the defendant's guilt. Of necessity, therefore, the *voir dire* examination of veniremen in capital cases has become an elaborate and frustrating process. The instant case demonstrates both the difficult position of the trial court and the need for a uniform standard of review of alleged *Witherspoon* violations.

Venireman Arturo Espindola was excluded from the jury based on the following interchange with the State's attorney:[10]

> "Q. Is this belief—you don't believe in the death sentence—as your being part of the jury that would have to inflict the death penalty?
> "A. Sir, I don't believe in the death penalty.
> "Q. At all?
> "A. At all.
>
> .        .        .        .        .

---

N. E. 2d 186, 190 (1975); *Peterson* v. *State*, 242 So. 2d 420, 426 (Miss. 1970); *Bean* v. *State*, 86 Nev. 80, 87, 465 P. 2d 133, 138 (1970); *Jones* v. *State*, 555 P. 2d 1061, 1066 (Okla. Crim. App. 1976); *State* v. *Tyner*, 273 S. C. 646, 651, 258 S. E. 2d 559, 562 (1979).

[8] *O'Bryan* v. *Estelle*, 714 F. 2d 365, 371–373 (1983) (assuming, without deciding, that *de novo* review is proper); *id.*, at 393 (Higginbotham, J., concurring) ("an independent review of the facts may be undertaken against a backdrop of trial court discretion"); *id.*, at 400 (Buchmeyer, J., dissenting) (deference appropriate only if trial judge made "*express* factual or credibility determinations").

[9] Compare *McCorquodale* v. *Balkcom*, 705 F. 2d 1553, 1556–1557, n. 9 (1983), with *Darden* v. *Wainwright*, 699 F. 2d 1031, 1037, rehearing en banc granted, 699 F. 2d 1043 (1983).

[10] A transcript of the *voir dire* examination of venireman Espindola is contained in Appendix C to the petition.

"Q. And, you could not vote for the death penalty in a case no matter how horrible the facts were?

"A. No, sir, I could not vote for the death penalty.

"Q. . . . [Y]ou are irrevocably committed before the trial begins to vote against the death penalty regardless of the facts and circumstances because of your belief?

"A. That's right." App. to Pet. for Cert. C–3 to C–4.

The State's attorney then explained to Espindola the Texas procedures for capital cases. The guilt and punishment phases are separated, and in the punishment phase the jury never votes directly to impose the death sentence. The jury is instead asked three questions about the nature of the crime and the probability of future violence by the defendant. If the jury answers "yes" to all three questions, the judge must impose the death penalty. Texas Code Crim. Proc. Ann., Art. 37.071(e) (Vernon Supp. 1982–1983). After explaining these procedures and reading the questions to the venireman, the questioning continued.

"Q. Because you don't believe in the death penalty, then would you automatically vote no to these questions no matter what the facts were to keep the man from getting a death sentence?

"A. I imagine I would.

"Q. All right. Because of your beliefs?

"A. Yes, because of my beliefs.

"[Q.] And, your belief would have a—would enter into these deliberations because you just don't believe in it, and you could not vote yes and you would vote no, is that right?

"A. That's right." App. to Pet. for Cert. C–8 to C–9.

Defense counsel then sought to rehabilitate Espindola on cross-examination.

"Q. And, if the State—the next thing I'll ask you before we get the effect is I will ask you—assume, if you will with me, that the prosecutors prove to you beyond any reasonable doubt that the evidence is there and the questions in your mind, you're convinced beyond any reasonable doubt that the questions should be answered yes, okay?

"A. Yes, I understand.

"Q. And, you're convinced of that in your mind beyond any reasonable doubt that the answers should be yes, okay?

"A. Yes, I understand.

"Q. And, would you be untruthful in your answer intentionally and would you just deliberately answer the question untruthful—untruthfully or would you answer the question according to what the evidence showed, according to your oath as a juror? Would you just intentionally and deliberately answer the question untruthfully?

"A. No, I would not.

.          .          .          .          .

"Q. So, you wouldn't answer it untruthfully?

"A. I would not answer untruthfully, no way.

"Q. So, if you were faced with—the questions that the prosecutor read to you over here, and you either had to answer the questions yes or no, and if you felt in your mind that the answers should be yes, and they have proved that to you beyond any reasonable doubt, and you're required to give a true answer to the questions asked of you, okay?

"A. Okay

"Q. Would you, simply because you knew what the effect of your answer would be, simply for that reason, would you deliberately answer those questions untruthful just because you knew what the effect of your answers would be?

"A. I said before that I wouldn't answer untruthfully." *Id.*, at C–10 to C–12.

Venireman Espindola thus gave directly contradictory answers to the same question posed in different terms by the prosecutor and by defense counsel. This is a classic instance in which the trial judge, based on his own observation of the interchange, is best able to determine whether the venireman could properly discharge his duties as a juror. Yet the Texas Court of Criminal Appeals conducted a *de novo* review of the record and held that the trial court improperly sustained the State's challenge for cause.

I find no support in our case law for the utter absence of deference paid to the trial court's judgment in this case. On the contrary, we have constantly stressed that "actual bias" on the part of a particular juror is a question of "historical fact," *Rushen* v. *Spain*, 464 U. S. 114, 120 (1983), on which the findings of the trial court should not be set aside unless clearly erroneous. See *Dennis* v. *United States*, 339 U. S. 162, 168 (1950) ("while empaneling a jury the trial court has a serious duty to determine the question of actual bias, and a broad discretion in its rulings on

challenges therefor"); *Reynolds* v. *United States*, 98 U. S. 145, 156 (1879) ("The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest"). See also *Smith* v. *Phillips*, 455 U. S. 209, 218 (1982) (findings of trial court on juror bias entitled to presumption of correctness in federal habeas action under 28 U. S. C. § 2254(d)). I see no reason why different principles should apply when the alleged bias concerns the juror's feelings about the death penalty.[11]

The question presented in this case is important, and the Court should provide better guidance to other courts faithfully striving to apply *Witherspoon*. Accordingly, I would grant the petition for certiorari.

[11] In *Adams* v. *Texas*, 448 U. S., at 46, we had occasion to discuss the circumstances under which a potential juror could be excluded under the very Texas statutory scheme at issue in this case.

"If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality."

This enunciation of the standard for exclusion makes clear the factbound nature of the inquiry and, hence, the appropriateness of deferring to the judgment of the trial court.